# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **STEVEN DE LEON,** | § | |
| **TDCJ No. 01847012,** | § | |
| | § | |
| **V.** | § | **A-18-CA-0362-LY** |
| | § | |
| **LORIE DAVIS, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Institutions Division.** | § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

TO:     THE HONORABLE LEE YEAKEL
        UNITED STATES DISTRICT JUDGE

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.

Petitioner, Steven De Leon, is represented by counsel and has paid the full filing fee for this case. Before the Court are Petitioner's Application for Writ of Habeas Corpus under 28 U.S.C. § 2254 and his Memorandum in Support (ECF Nos. 1 & 3), and Respondent's Answer (ECF No. 7). For the reasons set forth below, the undersigned recommends that the Application for Writ of Habeas Corpus be **denied**.

## STATEMENT OF THE CASE

According to Respondent, the Director has lawful and valid custody of Petitioner pursuant to a judgment and sentence imposed by the 421st Judicial Court of Caldwell County, Texas, on one count of continuous sexual abuse of a child.

# BACKGROUND

## A. Factual and Procedural Background

The Texas Third Court of Appeals summarized the testimony presented at Petitioner's trial:

DeLeon taught physical education at the elementary school M.G. attended. He met M.G. and her mother, D.A., in January 2010 when M.G. started playing on the school's fourth-grade basketball team. M.G. played basketball through the summer of 2011, and DeLeon spent time with D.A.'s family. The adults went on one date and never became romantically linked, though there was testimony that D.A. wanted more than a friendship. DeLeon testified that he helped D.A. with her finances, helped her start a checking account, and counseled her about her relationship with her son, D.G., who DeLeon also taught. DeLeon attended a parent-teacher conference regarding D.G. in place of D.A., helped M.G. with homework, and stayed with the children, sometimes overnight. The children stayed with DeLeon and his brother overnight once. M.G. testified that it was during such stays that DeLeon assaulted her in the summer of 2011.

M.G. first reported an assault in May 2012 after her mother found a recording of a March 19, 2012 telephone conversation between M.G. and DeLeon. The conversation began with a discussion of M.G.'s grandfather's surgery, but veered into sex-related topics. DeLeon deemed the shift in topics inappropriate and said that M.G. was responsible for the shift, but he admitted that he participated in the inappropriate discussions. In a discussion prompted by M.G.'s query of why DeLeon seemed uncomfortable whenever female body parts were discussed, DeLeon said, "It's kind of like with you like I remember like I would tell you: Well, am I hurting you? Or you know is everything okay? I just want to make sure that you're like comfortable." DeLeon testified that this statement referred to a basketball practice during which he had unknowingly hurt M.G. by inadvertently touching her breast and she had been embarrassed to explain her pain in front of the other players. . . . D.A. made a copy of the recording and took it to school officials, leading to the police investigation and this prosecution.

M.G. testified at trial that DeLeon assaulted her four times during the summer of 2011—three times at her home and once at his. She testified that one time he lay on top of her with his clothes on. M.G. said that another time he touched the outside of her private parts with his finger. She testified that DeLeon asked if she was okay or if he was hurting her. She said that, after this incident, she requested a different babysitter, but her mother still chose DeLeon. She testified that when she and her brother stayed overnight at DeLeon's house, DeLeon touched her private parts while her brother slept next to them. In the final incident, she testified that she and DeLeon were in her mother's room talking when DeLeon pulled his pants down and told her

to touch his penis. She said that she touched it briefly and that he then grabbed her hand, put it onto his penis, and moved their hands up and down on his penis while he grunted. She testified that, after five minutes, something gooey came out of his penis.

M.G. conceded at trial that she had related different versions of these assaults at different times to different audiences. M.G. told her mother that DeLeon assaulted her once, told a child advocate about three instances, and testified about four instances. At trial, she recanted her allegation to the child advocate that DeLeon had touched the inside of her vagina. She testified that the touching hurt but had told the child advocate that it had not hurt. At trial, she rejected her report that one of the incidents occurred during the day, insisting that it occurred at night. M.G. told a child advocate that the phone recorded the March 19 phone conversation without her knowledge, but she recanted that assertion at trial and explained the steps needed to make a recording. M.G. acknowledged at trial that she was sometimes perceived as "overly dramatic."

DeLeon argued that the allegations of assault were unfounded. He denied that he touched M.G.'s sexual organ and that she touched his. He denied being unclothed around the children and denied sleeping in a bed with them. DeLeon testified that his relationship with D.A. and her family changed in the fall of 2011 when she began dating a man whom DeLeon described as extremely jealous. . . .

\*\*\*

DeLeon's brother, who has lived with DeLeon for almost fifteen years, testified that he never heard DeLeon express a sexual interest in children. DeLeon's brother testified that they watched television together the night that M.G. said DeLeon assaulted her at the brothers' home. He testified that DeLeon slept on the couch that night. . . .

*DeLeon v. State*, No. 03-13-00202-CR, 2015 WL 3454101, at \*1-2 (Tex. App.– Austin 2015, pet.

ref'd). The jury deliberated for approximately four hours before returning a guilty verdict. (ECF

No. 8-39 at 129-30).

At the punishment phase, DeLeon's friends, colleagues, and family testified in support of DeLeon. They described him as a good teacher and a good person who was supportive and appropriate with children. A psychologist evaluated DeLeon and testified that the test results showed no sexual deviancy, that he is quite conservative in his sexual practices, that he showed no sexual interest in children, and that he scored very low on a scale of potential recidivism.

*DeLeon*, 2015 WL 3454101, at *2. The jury assessed Petitioner's punishment at a term of 32 years' imprisonment. *Id.* at *1.

Petitioner appealed his conviction, asserting the trial court improperly limited his ability to confront witnesses and put on a defense; the evidence was insufficient to support the verdict; the trial court erred by denying his motion for mistrial based on the prosecution's comment on his failure to testify during the punishment hearing; and his sentence violated the Eighth Amendment. *Id.* at *3. The appellate court overruled Petitioner's claims and denied a motion for a rehearing, and the Court of Criminal Appeals denied discretionary review. (ECF No. 8-6; ECF No. 8-13).

Petitioner, through counsel, sought a state writ of habeas corpus, asserting he was denied his rights to due process of law and a fair trial. He further alleged a violation of the Confrontation Clause and that he was denied the effective assistance of counsel. Petitioner also argued the Texas statute prohibiting continuous sexual abuse of a child was unconstitutional and that his sentence constituted cruel and unusual punishment. (ECF No. 8-38 at 8-20). The Texas Court of Criminal Appeals ordered the habeas trial court, which was not the convicting court, to conduct a hearing with regard to Petitioner's ineffective assistance of counsel claims. (ECF No. 8-32). The habeas trial court conducted a hearing, made findings of fact, and recommended the writ be denied. (ECF No. 8-35; ECF No. 8-37).[1] The trial court was ordered to issue supplemental findings and it complied with that order. (ECF No. 8-36; ECF No. 8-40). The Court of Criminal Appeals denied the writ on the findings of the trial court. (ECF No. 8-29; ECF No. 8-31).[2]

---

[1] The transcript of the hearing is appended to Petitioner's Memorandum of Law at ECF No. 3-14.

[2] The Court of Criminal Appeals did not adopt the trial court's "erroneous" finding that Petitioner "testified at the punishment phase of the trial against the advice of his counsel," but adopted its other findings. (ECF No. 8-29).

**B.    Federal habeas claims**

In his federal habeas petition Petitioner asserts:

> 1. He was denied his right to present a complete defense;
>
> 2. He was denied his right to confront and cross-examine witnesses;
>
> 3. He was denied effective assistance of trial counsel;
>
> 4. The State received the juror information cards five days before the defense and the complainant's mother was seen talking to a juror;
>
> 5. The continuous sexual assault of a child statute is unconstitutional;
>
> 6. His sentence violates the Eighth Amendment; and
>
> 7. His right to remain silent was violated when the State commented on his failure to testify during the punishment phase.

**C. Exhaustion of State Court Remedies**

Respondent allows Petitioner's petition is timely and not successive, and that his federal habeas claims were properly exhausted in the state courts. A review of the state court records submitted by Respondent shows that Petitioner has properly raised these claims in previous state court proceedings.

## ANALYSIS

**A. The Antiterrorism and Effective Death Penalty Act of 1996**

The Supreme Court summarized the basic principles established by the Court's many cases interpreting the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA") in *Harrington v. Richter*, 562 U.S. 86, 97-100 (2011). Section 2254(d) permits the granting of federal habeas relief if the state court's decision "was contrary to" federal law as clearly established by the holdings of the Supreme Court, if the state court's decision involved an "unreasonable application" of such law,

or when the decision "was based on an unreasonable determination of the facts" in light of the record before the state court. *Harrington*, 562 U.S. at 100, *citing Williams v. Taylor*, 529 U.S. 362, 412 (2000).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003). Under the unreasonable application clause of § 2254(d), a federal court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, "but unreasonably applies that principle to the facts of the prisoner's case." *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000) (quotation marks and citation omitted).

**B. Merits**

**1. Complete defense**

Petitioner's first and second claims arise from the trial court's decision prohibiting defense counsel from presenting Child Protective Services ("CPS") records of an investigation into D.A.'s physical abuse of the victim's younger brother. Defense counsel sought to use this evidence to establish D.A. had a motive to fabricate the allegations against Petitioner, but the trial court prohibited counsel from using these records when cross-examining the State's witnesses. (*Id.*)

In his first claim for federal habeas relief, Petitioner asserts he was denied his due process right to present a complete defense because the trial court prohibited the defense from utilizing this evidence. (ECF No. 3 at 27-28). Petitioner unsuccessfully raised this claim in his appeal. Because the Third Court of Appeals issued the only "reasoned" opinion on this issue, that court's decision

is reviewed to determine whether the state courts' denial of this claim was contrary to or an unreasonable application of federal law. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

A state's "broad latitude" to define and apply rules for the exclusion of evidence has constitutional limits. *See Clark v. Arizona*, 548 U.S. 735, 789 (2006). In some circumstances evidentiary restrictions that hinder a defendant's ability to present evidence can be severe enough to violate their due process right to present a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (holding that a defendant was denied a meaningful opportunity to present a complete defense where he was not allowed to cross-examine an alternative suspect or call witnesses for the purpose of impeaching that suspect's testimony). Although the Constitution prohibits the exclusion of defense evidence "under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote," trial judges may "exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury," without infringing the defendant's right to due process. *Holmes v. South Carolina*, 547 U.S. 319, 324, 326 (2006). *See also Taylor v. Illinois*, 484 U.S. 400, 410 (1988).

The state court cited *Crane* in denying relief on this claim, noting a criminal defendant has no absolute constitutional right to present favorable evidence:

> The improper exclusion of evidence may establish a constitutional violation (1) when a state evidentiary rule categorically and arbitrarily prohibits the defendant from offering relevant evidence that is vital to his defense; or (2) when a trial court precludes the defendant from presenting a defense by erroneously excluding relevant evidence that is a vital portion of the case.

*DeLeon*, 2015 WL 3454101, at *3. The appellate court found Petitioner failed to establish the evidence relating to D.A.'s abuse of her son had any relevance to whether Petitioner abused her daughter. *Id.* at *5. The appellate court then determined:

> [The evidence could] therefore be excluded absent some other theory of admissibility. *See* Tex. R. Evid. 402. Whether D.A. abused her son is not admissible impeachment evidence about her character for truthfulness and is not evidence of conviction for a crime. *See* Tex. R. Evid. 608(a), 609. It is a specific instance of conduct which "may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence." *See id.* 608(b).

*Id.* The court further determined Petitioner's counsel was able to question D.A.'s credibility and motives by other means. *Id.*

*Crane* requires consideration of two factors in determining whether the exclusion of evidence denies a defendant the right to present a complete defense. *See* 476 U.S. at 690. The first factor is the extent to which the evidence was "central to the defendant's claim of innocence, and the second is the extent to which its exclusion was supported by a "valid state justification[.]" *Id.* The Third Court of Appeals conducted the appropriate test and found the evidence was not central to Petitioner's claim of innocence and found the exclusion of the evidence was proper pursuant to state rules of evidence which served a valid state justification. Accordingly, the state court's decision was not clearly contrary to federal law. *Compare Nevada v. Jackson*, 569 U.S. 505, (2013) (holding defendant was not denied his right to present a complete defense when he was barred from presenting extrinsic evidence of victim's prior accusations of sexual assault by a state's "rape shield" law); *Holmes*, 547 U.S. at 328-31 (holding a state rule, barring evidence that the crime was committed by a third party if there was "'strong forensic evidence'" of the defendant's guilt, violated the right to present a complete defense); *Crane*, 476 U.S. at 690 (holding state court's evidentiary

ruling that the defendant's confession was voluntary and therefore admissible, but excluding testimony about the circumstances of his confession, was without any rational justification); *Chambers*, 410 U.S. at 302 (holding state's "voucher rule," prohibiting evidence of witness's out-of-court confession to the crime, denied the defendant the right to present a complete defense).

Nor was the state court's decision an unreasonable application of the rule stated in *Crane* and *Holmes*. The right to present a complete defense is a broad rule, and the Supreme Court has counseled federal habeas courts that "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). The United States Supreme Court's decisions involving a defendant's constitutional right to present a complete defense demonstrate the generality of the right and the substantial element of judgment required of trial courts in excluding defense evidence. *See Jackson,* 569 U.S. at 509 ("Only rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence."); *Brown v. Ruane*, 630 F.3d 62, 72-73 (1st Cir. 2011).

The Texas appellate court concluded that, in light of Petitioner's other avenues for advancing his defense, the restrictions placed upon counsel's cross-examination of D.A. did not prejudice the defense. This conclusion was not unreasonable. Furthermore, Petitioner has not established any error in excluding this evidence had a substantial and injurious effect or influence on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (holding due process claims are subject to harmless error analysis, citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

**2. Confrontation Clause**

Petitioner also contends the trial court violated his Confrontation Clause rights by ruling that the CPS records could not be referenced during cross-examination of the State's witnesses. He raised this claim in his appeal and relief was denied. *DeLeon*, 2015 WL 3454101, at *5.

The Confrontation Clause provides defendants the right to rebut the prosecution's evidence through cross-examination. *See Davis v. Alaska*, 415 U.S. 308, 316 (1974). However, although the Confrontation Clause guarantees an opportunity for effective cross-examination, it does not guarantee cross-examination that is effective in whatever way and to whatever extent the defense might wish, and trial courts retain wide latitude to impose reasonable limits on cross-examination. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *Davis*, 415 U.S. at 315; *Boyer v. Vannoy*, 863 F.3d 428, 448-49 (5th Cir. 2017), *cert. denied*, 2018 WL 1142566 (No. 17-7930) (Oct. 1, 2018). To determine whether a trial court's restriction on cross-examination is reasonable, a reviewing court must assess whether the jury was given adequate information to appraise the bias and motives of the witness. *Johnson v. Puckett*, 176 F.3d 809, 820-21 (5th Cir. 1999).

The appellate court conducted the proper inquiry regarding the trial court's reason for the exclusion of this evidence and determined that any error in prohibiting the defense from referring to the CPS investigation was not harmful, noting defense counsel succeeded in otherwise challenging D.A.'s bias. A thorough review of the trial transcript demonstrates that any error in precluding evidence of the CPS investigation did not have a substantial and injurious effect on the jury's verdict and, therefore, any error was harmless. *See Fratta v. Quarterman*, 536 F.3d 485, 507-08 (5th Cir. 2008) (reviewing a Confrontation Clause violation under the harmless error standard). The jury made a determination that M.G.'s testimony was credible and presumably buttressed by the recording of

the phone conversation between Petitioner and M.G., and found Petitioner's denial of the charges not credible. D.A.'s credibility was called into question by other testimony, and any additional information challenging D.A.'s credibility or bias would not likely have swayed the jury's decision. A reasonable jury would not have received a "significantly different impression" of D.A.'s credibility had defense counsel been able to use the CPS records in cross-examination. *Van Arsdall*, 475 U.S. at 680. Therefore, the state court's rejection of this claim was not clearly contrary to or an unreasonable application of federal law.

### 3. Ineffective assistance of trial counsel

Petitioner claims trial counsel was ineffective for failing to investigate and present an alibi defense. Petitioner asserts there was available evidence he was not in Caldwell County on the dates D.A. testified the alleged assaults must have occurred, and that trial counsel should have subpoenaed the security log for M.G.'s residence to establish which days Petitioner was at her home, where two of the assaults were allegedly committed. (ECF No. 1 at 7; ECF No. 3 at 35-42, 55-56). Petitioner also contends trial counsel failed to contact potential witnesses and failed to prepare witnesses to testify. (ECF No. 3 at 44-51, 51-55). Petitioner raised all of these ineffective assistance of counsel claims in his state action for habeas relief, and the Court of Criminal Appeals denied the writ without written order.

Ineffective assistance of counsel claims are analyzed under the well-settled standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show that counsel's representation fell below an objective standard of reasonableness and a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687. When deciding whether counsel's

performance was deficient, the Court must apply a standard of objective reasonableness, mindful that judicial scrutiny of counsel's performance must be highly deferential. *Id.* at 686-89.

The prejudice prong of *Strickland* provides for federal habeas relief only if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "'The likelihood of a different result must be substantial, not just conceivable.'" *Trevino v. Davis*, 829 F.3d 328, 351 (5th Cir. 2016), *cert. denied*, 138 S. Ct. 179 (2018) (quoting *Brown v. Thaler*, 684 F.3d 482, 491 (5th Cir. 2012)).

The Fifth Circuit has determined that both prongs of the *Strickland* test involve mixed questions of law and fact. *Smith v. Quarterman*, 515 F.3d 392, 403 (5th Cir. 2008); *Nobles v. Johnson*, 127 F.3d 409, 418 (5th Cir. 1997). Whether counsel made a decision to pursue a particular trial strategy is a question of fact and whether that strategy was reasonable is a question of law. *Wood v. Allen*, 558 U.S. 290, 301, 304 (2010); *Trottie v. Stephens*, 720 F.3d 231, 244 (5th Cir. 2013). A habeas petitioner has the burden of proving both prongs of the *Strickland* test. *Rogers v. Quarterman*, 555 F.3d 483, 489 (5th Cir. 2009); *Blanton v. Quarterman*, 543 F.3d 230, 235 (5th Cir. 2008).

### a. Alibi defense

Petitioner contends counsel failed to investigate and present the alibi that he was not in town on the dates when it was alleged he assaulted M.G. (ECF No. 3 at 35-41).

With regard to the charge of continuous sexual assault, the indictment alleged two or more sexual assaults occurred from on or about June 3rd, 2011, until August 27th, 2011. (ECF No. 8-14 at 9). M.G. testified that the incidents occurred when her mother was working or volunteering at the

VFW; she further testified she saw Petitioner "every day" that summer. (ECF No. 8-21 at 183, 188-89, 204, 210). D.A. testified Petitioner watched M.G. when she worked at the VFW on June 3rd, June 18th, July 2nd, July 30th, August 20th, and August 27th. (ECF No. 8-21 at 123-24, 127).[3] Petitioner asserts counsel should have proffered bank statements and testimonial evidence establishing he was on a trip to Las Vegas with his brothers for several days beginning June 3, 2011; that he was at a memorial service in San Antonio on June 18 and also in San Antonio on July 30; and that his family was staying at Petitioner's residence for the entire weekend beginning July 2. (ECF No. 3 at 36-39). Petitioner further contends counsel failed to present the testimony of his girlfriend to negate D.A.'s claim that Petitioner spent the night at D.A's house five nights a week during the summer of 2011. (ECF No. 3 at 40).[4]

Petitioner raised this claim in his state habeas action, and several family members provided affidavits and testified at the state habeas hearing that Petitioner was not in Caldwell County on the dates when the alleged assaults occurred. (ECF No. 8-39 at 80, 86).[5] Two of Petitioner's brothers stated Petitioner was in San Antonio on the night of June 3, 2011, and that they then traveled to Las Vegas where they remained until "around June 10th." (ECF No. 8-39 at 86). One brother averred he

---

[3] D.A. used a calendar to determine which specific dates Petitioner watched the children while she worked or volunteered at the VFW. (ECF No. 8-21 at 126-27).

[4] The girlfriend's affidavit states: "During the summer of 2011, he and I stayed the night together quite often . . . ." (ECF No. 3-7 at 1). It further states: "During the summer of 2011 I never saw the kids around Steven at all. . . . During the summer, I saw Steven a lot. We saw each other most days and we spent most nights together." (ECF No. 3-7 at 2).

[5] Petitioner's brother's affidavit states that, during the summer of 2011, "Steven stayed at our home pretty much every night," and that "[h]e was dating a girl named Lynn and I know that he stayed the night [at] Lynn's house often and Lynn also stayed at our house often. Steven may have stayed at [D.A.'s] house a few times, but not that often." He further stated: "M.G. did stay the night at our house the summer of 2011, but I only personally remember her staying one night." (*Id.*).

and several other family members stayed at Petitioner's home from Friday night July 1, 2011, through the following Monday, and that M.G. did not spend the night at Petitioner's that weekend. (*Id.*). He further stated Petitioner was not in Caldwell County on July 30. (*Id.*). The family members indicated Petitioner was in San Antonio on June 18 for their father's memorial service. (ECF No. 8-39 at 94).

Counsel addressed the alibi defense at the state habeas hearing, stating some of the family members' statements were contradictory and he feared losing credibility with the jury by presenting unsubstantiated testimony that Petitioner was not in town on the dates when the alleged events occurred. (ECF No. 3-14 at 61).

Counsel further testified at the state habeas hearing as follows:

> Q. And you stated you looked over the affidavits that were provided in the application and that there are gaps and errors in everybody's in regards to dates?
> [Defense counsel]. I don't think anybody can reconstruct the summer. I don't think anybody can do that day by day, so naturally there is going to be differences and discrepancies in all these affidavit, which there are.
> Q. And did you consider during your trial strategy in the guilt-innocence that you can't reconstruct a summer?
> A. Yes.
> Q. And did that come into play when you decided what witnesses to call during guilt and innocence?
> A. Absolutely.

(ECF No. 3-14 at 64-65).

After the hearing the habeas trial court found:

> . . . the testimony on the trip to Las Vegas was unclear, as neither of the two brothers who accompanied [DeLeon] to Las Vegas testified as to any specific date that they left. (2 R.R. 163, 216) [DeLeon]'s counsel testified [DeLeon] and his brothers were unable to provide any proof documenting the trip at all, (2 R.R. 26-27, 60), that the two brothers were uncertain whether they left on June 3 or June 4 (2 R.R. 60) and that he thought the jury would view any testimony of such a trip as being false. (2 R.R. 27, 60-61) [DeLeon]'s writ attorneys acknowledged the inherent problem of

14

establishing an alibi witness in light of the 'on or about' date standard in felony indictments. (2 R.R. 20)

Conclusion of Law

The inability of [DeLeon] and his brothers to remember the exact dates of the Las Vegas trip, coupled with the flexibility of the 'on or about' concept do not support a finding that [DeLeon]'s counsel was negligent in failing to present additional evidence on this point and fall within accepted parameters of trial strategy. There is no evidence of ineffectiveness of counsel.

(ECF No. 8-37 at 4).[6] The habeas trial court further found:

[DeLeon] was convicted on Count 1 of the indictment, which includes the offense date range June 3, 2011 through August 27, 2011. [DeLeon] has focused on his counsel's failure to call alibi witnesses for the following dates: June 18, 2011, July 2, 2011, and July 30, 2011. [DeLeon]'s writ attorneys acknowledged the inherent problem of establishing an alibi witness in light of the 'on or about' date standard in a felony indictment. (2 R.R. 20) [DeLeon] testified that he was in San Antonio on the day of June 18, 2011. (2 R.R. 249) [DeLeon]'s mother also testified that he was in San Antonio on the day of June 18, 2011, but not the night of June 18, 2011 (2 R.R. 195-196) [DeLeon] and Christine De Leon stated that M.G. was at [DeLeon]'s house on July 2, 2011 and spent the night. (2 R.R. 178, 250-251) [DeLeon] and his family members also recollect that on July 30, 2011, they were in San Antonio with an Uncle, but are unable to express that anyone stayed the night. (2 R.R. 46, 166) [DeLeon]'s counsel testified the specific dates are there for the indictment, but the statute of limitations dates apply to whether the offense is proven. (2R.R. 57-58)

Conclusions of Law

The flexibility of the 'on or about' concept does not support a finding that [DeLeon]'s counsel was negligent in failing to present additional evidence on this point and falls within accepted parameters of trial strategy. The dates in question are dates that the victim's mother testified she had been working at the VFW. [DeLeon]'s counsel testified that [DeLeon] was around the victim's family the entire summer. (2 R.R. 24) [DeLeon] also did not have an alibi for the whole day on June 18, 2011 and July 30, 2011, and . . .[DeLeon] had access to M.G. on July 2, 2011. [DeLeon]'s counsel was not deficient in failing to present evidence as to [DeLeon]'s alibi for June, 18, 2011, July 2, 2011, and July 30, 2011, due to the flexibility of the 'on or about' concept.

---

[6] At the conclusion of the hearing, Petitioner's habeas counsel "informed the court that it had additional facebook posts to admit," verifying that Petitioner and his brothers were in Las Vegas from June 4 through June 10, 2011, "and the court agreed to leave the record open." (ECF No. 3-16 at 1). Other submitted social media posts supported the family members' statements that Petitioner was not in Caldwell County on June 18, July 2, July 17, July 18, and July 30. (ECF No. 3-16 at 6-24).

(ECF No. 8-36 at 3-4).

Petitioner also alleges trial counsel was ineffective for failing to subpoena security logs of individuals entering M.G.'s residence to show when he was at her house. (ECF No. 3 at 55-56). Petitioner alleges he asked counsel to subpoena these records in order to establish "which specific dates he was at M.G.'s home during the summer 2011 in order to narrow down whether the allegations could have even occurred over 30 or more days." (ECF No. 3 at 56). He allows counsel did subpoena records relating to when D.A. arrived and left the premises, and both defense counsel and the defense investigator testified at the habeas hearing that these records were subpoenaed but not received. (ECF No. 3-14 at 41-42, 86-87). At the state habeas hearing, when asked how many subpoenas he had issued in the case, defense counsel agreed he had issued "over 10 subpoenas," including subpoenas to the VFW where D.A. worked and "Gary Job Corp" where D.A. lived with her children. (ECF No. 3-14 at 64-65).

The state court's denial of Petitioner's claim that counsel failed to adequately investigate and present an alibi defense was not an unreasonable application of *Strickland*. In addition to the specific findings and conclusions previously quoted, the habeas trial court found counsel's investigation of the case was not below prevailing professional norms, noting counsel conducted an "e-jury" in the matter, hired a private investigator, and retained a second attorney to assist with jury selection. (ECF No. 8-37 at 7). The habeas court concluded: "Each individual allegation made by Applicant is defensible under the facts obtained at hearing and under the latitude afforded defense counsel under trial strategy." (ECF No. 8-37 at 7).With regard to prejudice, the state court determined "a telephone conversation between Applicant and Victim [] was extremely prejudicial to Applicant [and] was

admitted in evidence . . . []The contents of the conversation support Applicant's counsel's decisions on many of these issues as being within the scope of trial strategy." (ECF No. 8-37 at 7).

"[C]ounsel has wide latitude in deciding how best to represent a client . . ." *Yarborough v. Gentry*, 540 U.S. 1, 5-6, 8 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."). Counsel's choice of a defense and his strategy in arguing that defense to a jury are "virtually unchallengeable." *Strickland*, 466 U.S. at 690; *Trottie*, 720 F.3d at 243 (holding the failure to present a particular line of argument is presumed to be the result of strategic choice). Federal habeas courts presume that counsel's choice of trial strategy is objectively reasonable unless clearly proven otherwise. *Strickland*, 466 U.S. at 689. Petitioner has not overcome the presumption that his counsel's conduct was strategically motivated nor refuted the presumption that counsel's actions fell within the wide range of reasonable professional assistance. *See Harrington*, 562 U.S. at 105 ("The *Strickland* standard is a general one, so the range of reasonable applications is substantial."); *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (holding that *Strickland* is a general standard and, accordingly, "a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.").

Petitioner also fails to affirmatively prove that, but for counsel's errors, the result of the proceeding would be different. The outcome of this matter was apparently based on M.G.'s testimony and the jury's interpretation of the recorded conversation between M.G. and Petitioner. By its verdict the jury indicated it found M.G. credible and Petitioner's denial of the charges not credible. Because the omitted evidence was not sufficiently conclusive as to whether Petitioner could

not have committed the assaults during the time period alleged in the indictment, Petitioner is unable to establish the requisite prejudice under *Strickland*.

### b. Preparing witnesses

Petitioner complains trial counsel was ineffective for failing to prepare his brother and himself to testify during the guilt/innocence phase, and failed to prepare his mother and sister-in-law to testify during the punishment phase. (ECF No. 3 at 42-44, 47-48, 50-55). After conducting a hearing and receiving counsel's testimony on this point, the state habeas court found defense counsel met with Petitioner's brother "several times in preparation for trial," and that "Frank DeLeon was adequately prepared for his testimony." (ECF No. 5-37 at 5). The court also found counsel met with Petitioner's mother twice to prepare her to testify during the punishment phase, noting counsel "gave her direct instructions . . . which she ignored." (*Id.*). The court found the sister-in-law "testified well and appropriately during the punishment phase of the trial." (*Id.*).

With regard to the allegation that counsel failed to prepare Petitioner to testify, the habeas trial court found Petitioner had met with counsel at least five times, and spoke with him via telephone "numerous times." (ECF No. 5-37 at 6). The court also found counsel had practiced direct and cross-examination with Petitioner. (*Id.*). The court determined Petitioner had presented "no evidence" he was not properly prepared for trial, and concluded he was "adequately prepared by his trial counsel . . ." (*Id.*).

Petitioner has not shown that the state court's decision was an unreasonable application of *Strickland*. The state habeas court's factual determinations, including its credibility findings, are entitled to a presumption of correctness unless they lack fair support in the record. *Demosthenes v. Baal*, 495 U.S. 731, 735 (1990); *Miller v. Thaler*, 714 F.3d 897, 903 (5th Cir. 2013). The habeas trial

court's findings are supported by the trial transcript and the record of the state habeas hearing. Petitioner fails to overcome the presumption that counsel's fell within the wide range of reasonable professional assistance. *See Harrington*, 562 U.S. at 105.

### c. Contacting potential witnesses

Petitioner alleges trial counsel failed to contact and investigate potential witnesses for both the guilt/innocence and punishment phases of his trial, including his sister, his brothers Anthony, Jacob, and Michael DeLeon, his sister-in-law, his girlfriend, and his mother. (ECF No. 3 at 44).

At the state habeas hearing counsel testified that Petitioner would not allow counsel or the defense investigator to talk to any of his family members, other than his brother Frank. (ECF No. 3-14 at 37, 39, 41 ("Steven was adamant about not, especially, talking to his mother about this case. I mean, he was adamant.") ("but, again, Steven was . . . adamant that they didn't have relevant information. He was so embarrassed. And he did not want me or Neal talking to them. I said, we need to if there is something they have that can help. He said, they don't know anything about this.") ("I talked to Frank a lot. And because he was the one that said he had relevant information. . . . The others said they didn't and Steven said leave them alone.")). Additionally, the defense investigator testified at the state habeas hearing that Petitioner did not believe his family could provide helpful information and Petitioner did not want his family interviewed. (ECF No. 3-14 at 91, 92, 97, 98, 99 ("he told me that he didn't think that the family needed to be interviewed in reference to that because they didn't know anything.") ("He said he didn't think it was necessary because they didn't know anything about the case.") ("he did not want me to speak with the family members . . .[a]bout the fact they had any knowledge of what went on, the allegations.") ("And, again, Mr. De Leon did not want

me to speak to the family members.") ("He did not want me to talk to [his family members] concerning anything pertaining to the case.")).

The state habeas court found Petitioner had "ordered" his counsel not to contact family members, other than his brother Frank, "as they had no specific knowledge about the alleged incidents and [] he was embarrassed about the situation," noting the defense investigator also testified Petitioner told him "not to talk to family members because they did not know anything." (ECF No. 8-36 at 4).

The court concluded:

> The evidence supports the conclusion that [DeLeon] did not want his attorney to talk to his family members, other than his brother Frank, prior to him being convicted. In addition to calling[DeLeon] and his brother Frank De Leon, [DeLeon]'s counsel called six witnesses on guilt/innocence. . . . The decision of [DeLeon]'s counsel to not call additional family members on guilt/innocence is a legitimate exercise of trial strategy and does not indicate ineffectiveness of counsel.

(ECF No. 8-37 at 5).

The habeas trial court made findings of fact with regard to DeLeon's allegation that counsel failed to present specific or sufficient witnesses during the punishment phase:

> . . . The record reflects that [DeLeon]'s counsel called nine witnesses in the punishment phase (1 T.R.R. 6), including two family members and a doctor who holds a PhD in clinical psychology. (7 T.R.R. 103) One of the family members was [DeLeon]'s mother who criticized the jury's verdict on guilty. (2 R.R. 46, 49, 63) [DeLeon]'s counsel testified that he thought he called one other family member (2 R.R. 46), but called no additional family members in fear of further insulting the jury's decision. (2 R.R. 47) The trial record does reflect that [DeLeon]'s sister in law,[], was called at punishment. (7 T.R.R. 87) Several witnesses were called to testify to the [DeLeon]'s good character. (7 T.R.R. 73-86)
> Conclusions of Law
> [DeLeon]'s counsel made a trial strategy decision to not call additional family members and risk further alienation of the jury. Several character witnesses were called, including a clinical psychologist who testified favorably for [DeLeon]. (7 T.R.R. 103- 107) The decision to not call additional character witnesses from the family was a legitimate trial strategy decision and does not indicate ineffectiveness

of counsel. This court further notes that [DeLeon] testified at the punishment phase of the trial against the advice of his counsel. (2 R.R. 280)

(ECF No. 8-37 at 6).

With regard to counsel's failure to call Petitioner's girlfriend as a witness, the habeas trial court found counsel had interviewed her and made a strategic decision not to call her as a witness. (ECF No. 8-36 at 5). The court concluded the strategy was reasonable and that any testimony from the girlfriend, or any other additional witnesses, would have been cumulative. (*Id.*).

Counsel's strategic choices, such as the presentation of witnesses, made after a thorough investigation of the law and facts relevant to plausible options, are virtually unchallengeable. *Strickland*, 466 U.S. at 673; *Pape v. Thaler*, 645 F.3d 281, 289-90 (5th Cir. 2011). The Fifth Circuit has "consistently found counsel's decision regarding examination and presentation of witnesses and testimony to fall within th[e] category of trial strategy which enjoys a strong presumption of effectiveness." *Pape*, 645 F.3d at 291. Counsel is not ineffective for failing to present cumulative or strategically omitted testimony. *Trottie*, 720 F.3d 244. Furthermore, if the "failure" to present mitigation evidence is based on well-informed strategic decisions, it is within the range of professional choices by counsel to which a federal habeas court must defer. *Martinez v. Dretke*, 404 F.3d 878, 890 (5th Cir. 2005); *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992); *Ortiz v. Livingston*, 420 F. Supp. 2d 670, 706 (W.D. Tex. 2006). Additionally, the reasonableness of counsel's actions is weighed in light of the defendant's own statements and actions. *Strickland*, 466 U.S. at 691.

Petitioner fails to overcome the presumption that his trial counsel's defensive strategy was within the wide range of reasonable professional assistance. The record contains sufficient evidence to demonstrate that counsel's strategic decisions were informed and fell within the wide range of trial

tactics that constitute reasonable assistance. *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009). "On habeas review, if there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard, the state court's denial must be upheld." *Rhoades v. Davis*, 852 F.3d 422, 432 (5th Cir. 2017) (internal quotations omitted).

### 4. Jury issues

Petitioner alleges his right to a fair and impartial jury was violated because the prosecutors asked for and received the jurors' voir dire information several days prior to trial, although defense counsel was not provided with this information until the first day of trial. Petitioner raised this claim in his state habeas action. (ECF No. 8-38 at 36). The attorney hired to assist Petitioner's trial counsel with voir dire filed an affidavit in the state habeas action, stating:

> . . . February 19, 2013 was the first day of trial. When we began voir dire we heard the male prosecutor make a comment to his wife (the female prosecutor) regarding the juror information cards. It appeared from his comment they received the cards on the Friday prior to our Tuesday start date. Kevin Collins and I asked the prosecution if they had seen the cards previously and they stated that they had and in fact gone to the clerk's office to gain access to the cards the Friday prior. After the Court qualified the jurors the State immediately requested a jury shuffle. We had not reviewed the cards in order to know why at that point a shuffle would be requested. We then realized they had the cards for 5 days prior and had studied them during that time.
>
> I have been a licensed attorney for 12 years, including 3 years as a prosecutor and have tried close to 100 jury trials. In all that time I have never seen either side get a copy of juror cards prior to the other side. In every case I have tried each side gets the information cards at the same time and at the conclusion of voir dire the bailiffs take the cards from both sides as they contain [personal] information. It was clearly apparent that the prosecutors in this case took these cards home with them and studied them over the 4-day period. This was a clear disadvantage to the defense given how quickly we had to learn the jurors' information.
>                                       ***
> Even after the shuffle the prosecution was still at a clear advantage as they were organized and knew the information. In fact, I remember thinking at the time the shuffle was requested that the prosecution was attempting to gain advantage as we were just beginning to review the cards and organize our charts. They could

clearly see this, as it is a small courtroom. Again, they had four days to prepare so not knowing the new order would not negate the fact that they know each jurors information.

(ECF No. 8-39 at 119-20). Both prosecutors submitted affidavits to the state habeas trial court averring that, although they received the juror cards several days before the trial, they did not review the juror cards until the first day of trial, the same date defense counsel was provided with this information. (ECF No. 3-15 at 9, 11).

The habeas trial court initially did not make any findings of fact with regard to Petitioner's claims, but instead forwarded the writ application to the Texas Court of Criminal Appeals, which remanded for findings on the claims of ineffective assistance of counsel. The habeas trial court did not address Petitioner's claims regarding the voir dire information in recommending the writ be denied, and Petitioner's counsel did not discuss any claims other than the ineffective assistance of counsel claims in the objections to the trial court's findings. The Court of Criminal Appeals denied the writ without written order. Accordingly, there is no "reasoned" opinion from a state court with regard to this claim.

In asserting this claim, Petitioner argues his "right" to peremptory challenges was impaired because he did "not receive that which state law provides." (ECF No. 3 at 59). Citing Texas state court opinions, Petitioner contends that allowing the prosecution access to the voir dire panel's information violated his right to intelligently exercise peremptory challenges, "rendering the jury selection process in his case unfair." *Id.* Petitioner does not assert that any seated juror exhibited bias.

The Supreme Court has held that peremptory challenges are not a federal constitutional right, *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988); *Gray v. Mississippi*, 481 U.S. 648, 663 (1987), but are

instead a state-created means to insure the constitutional right of an impartial jury and a fair trial. *Georgia v. McCollom*, 505 U.S. 42, 57 (1992). The Supreme Court has rejected "the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." *Ross*, 487 U.S. at 88. And the Supreme Court has further held the right to a peremptory challenge under state law may be completely withheld without impairing the constitutional guarantee of an impartial jury. *McCollom*, 505 U.S. at 57. As peremptory challenges are not a federal constitutional right and Petitioner makes no showing that any sitting juror was actually biased, he has failed to show how any particular method for administrating peremptory strikes impacted his constitutional rights.

Petitioner also alleges his brother witnessed a juror talking to the complainant's mother, D.A. (ECF No. 3 at 61-62). Citing *Remmer v. United States*, 347 U.S. 227 (1954), Petitioner summarily contends he "has therefore established he is entitled to relief." (ECF No. 3 at 62).

Petitioner's brothers submitted affidavits in the state habeas action. One brother averred:

> During the trial, I sat outside in the hallway. I would see [D.A.] come and go and she was always smiling and laughing. It seemed like her demeanor was weird for the seriousness of the case. I also saw her interact with a juror at one point. They did not have a conversation, but this juror was looking for the clerk's office and [D.A.] helped him find the right door. She overly friendly and willing to help him. As a witness, I just felt that it was inappropriate to interact with the jurors.

(ECF No. 8-39 at 82).

A different brother's affidavit states:

> During trial, while the court was on recess, I was sitting in the hallway. I saw one of the jurors talking with [D.A.], the complainant's mother. They were talking like they knew each other. When I walked by them, they stopped. I could not hear what they were saying, but based on their demeanor and body language I could tell that it was a friendly conversation.
> I notified Mr. Collins who brought it to the attention of the judge. When the jurors came back, the judge simply reminded them not to speak with anyone. . . .

(ECF No. 8-39 at 113).

Respondent incorrectly states that the only "evidence" of this interaction is the brothers' statements. (ECF No. 7 at 31) ("It cannot be over emphasized enough that the only evidence the conversation ever took place is from the complainant's brother."). On the second day of trial, the following exchanges occurred:

> MR. COLLINS: Your Honor, after we closed yesterday evening, a family member of my client reported to me that [D.A.], who is the mother of the Complainant who testified yesterday, was seen talking to a juror. Obviously, I didn't see it. I didn't hear it. I don't know what the exchange was, but there was some exchange between Mrs. Adams and a juror, which is highly inappropriate.
>
> THE COURT: Well, I will caution people not to talk. I have no idea. Do you have some information?
>
> MRS. ALSOBROOK: I believe our witness coordinator, Misty Plaia, witnessed something.
>
> THE COURT: What was that, ma'am?
>
> MS. PLAIA: A juror actually walked through Janice's office and said he needed a juror excuse.
>
> THE COURT: Went to the wrong office?
>
> MS. PLAIA: So I directed him back around to the District Clerk's Office. When Mrs. Adams and I [were] walking out the door, he was standing in front of our door, and she directed him to go to the District Clerk's Office.
>
> THE COURT: All right. Very well. I am not going to call jurors in on this. I will admonish – I will instruct lawyers to re-admonish their people not to talk about this.
>
> MR. COLLINS: Your Honor, I would move for a mistrial at this time.
>
> THE COURT: I am not going to grant that. There has been no evidence. We don't even know which juror it was, and certainly there has been no indication that there has been any inappropriate communications . . . And I don't have any indication from any source that there has been anything inappropriate.
>
> MR. COLLINS: Your Honor, I wanted to inquire of the clerk. If she's here, I wanted to hear exactly what was said. I didn't get that.
>
> THE COURT: Ms. Plaia?
>
> MS. PLAIA: Yeah. Mrs. Adams opened the door, and I was a few steps behind her. And the juror was standing in front of our door. And I saw her motion towards the door and say, "District Clerk's Office."
>
> THE COURT: All right. Thank you.
>
> MR. COLLINS: Did you hear what the juror said to her?
>
> MS. PLAIA: No.

***

MR. COLLINS: Which juror was it? Do you know? What was the name?

MS. PLAIA: I don't know his name.

MR. COLLINS: Could you describe him?

THE COURT: Counsel, that's enough. I have heard enough. We haven't heard any indication whatsoever that there has been anything inappropriate from anything. I will caution the jury, as a group again, "Please do not communicate with and do not allow anybody to communicate with you." But I haven't heard anything to indicate there has been any inappropriate communication.

MR. COLLINS: The last thing on this: I would like to be able to ask Mrs. Adams about this, as well.

THE COURT: During the break we will do that, but – you can ask her about it, but right now we're not going to put her on the witness stand to do that.

(ECF No. 8-22 at 7-10). When the jury returned, the trial court admonished the jury: "I just need to caution you, please do not communicate with any of the potential witnesses in any way. Don't allow them to communicate with you or with anybody else involved in this case." (ECF No. 8-22 at 13-14).

Petitioner argues that the trial court's failure to hold a hearing and investigate the communication between D.A. and the juror violated his federal constitutional rights, citing *Remmer*. The facts of *Remmer* are not similar to this case. In *Remmer,* an individual remarked to a juror "that he could profit by bringing in a verdict favorable to the petitioner." 347 U.S. at 228.

> The juror reported the incident to the judge, who informed the prosecuting attorneys and advised with them. As a result, the Federal Bureau of Investigation was requested to make an investigation and report, which was accordingly done. The F.B.I. report was considered by the judge and prosecutors alone, and they apparently concluded that the statement to the juror was made in jest, and nothing further was done or said about the matter. Neither the judge nor the prosecutors informed the petitioner of the incident, and he and his counsel first learned of the matter by reading of it in the newspapers after the verdict.

*Remmer v. United States*, 347 U.S. 227, 228 (1954).

The affidavits offered by Petitioner's brothers in support of this claim do not imply that the unspecified juror discussed the facts or evidence presented during the trial. A juror is improperly influenced when they are party to a communication that concerns "the matter pending before the

jury." *Joyner v. Barnes*, 135 S. Ct. 2643, 2646-47 (2015) (mem.). Although private contact or communication with a juror during a trial *about the matter pending before the jury* is "deemed presumptively prejudicial," *Remmer*, 347 U.S. at 229, the only evidence before the trial and habeas courts was that D.A. instructed the juror as to how to find the clerk's office. A federal habeas court must defer to a state court's factual finding that there was no improper jury contact unless the petitioner "presents 'clear and convincing' evidence to the contrary." *Oliver v. Quarterman*, 541 F.3d 329, 342 (5th Cir. 2008) (quoting 28 U.S.C. § 2254(e)(1)). Habeas petitioners are not entitled to relief based on an improper contact with the jury "unless the error 'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 341. *See also Ward v. Stephens*, 777 F.3d 250, 268 (5th Cir. 2015), *abrogated on other grounds by Ayestas v. Davis*, 138 S. Ct. 1080 (2018). Petitioner fails to make a showing that any contact was improper or that the state court's handling of the matter was other than harmless error.

### 5. Unconstitutional statute

Petitioner contends Texas Penal Code § 21.02, proscribing continuous sexual abuse of a child, is unconstitutional. (ECF No. 1 at 11; ECF No. 3 at 54-62). He argues the statue is unconstitutional because it does not require the jury to "be unanimous about 'which specific acts of sexual abuse were committed . . . or the exact date when those acts were committed.'" (ECF No. 3 at 56-57).

Federal habeas relief is only available when a petitioner's federal constitutional rights have been violated. 28 U.S.C. § 2254(a); *Sawyer v. Whitley*, 505 U.S. 333, 352 (1992); *Green v. Johnson*, 160 F.3d 1029, 1036 (5th Cir. 1998). There is no federal constitutional right to a unanimous jury verdict in state criminal proceedings. *Apodaca v. Oregon*, 406 U.S. 404, 406, 412 (1972).

Petitioner's argument that his right to due process requires jury unanimity was rejected by the United States Supreme Court in both *Apodaca* and *Johnson v. Louisiana*, 406 U.S. 356, 359 (1972) ("We note at the outset that this Court has never held jury unanimity to be a requisite of due process of law.").

Furthermore, because the Texas statute requires a unanimous verdict on the substantive charge of continuous sexual abuse of a child, rather than on the manner and means of committing that crime, Petitioner's conviction did not violate his right to a majority verdict pursuant to the holdings of the United States Supreme Court. In *Schad v. Arizona*, 501 U.S. 624 (1991), the Supreme Court recognized the general rule that a single count in an indictment may include allegations that the defendant committed the offense by one or more specified means, and held that there is no constitutional requirement that the jury reach unanimity on the preliminary factual issues which underlie the verdict. *Id.* at 631-32 (plurality opinion) & 649-50 (Justice Scalia's separate concurring opinion in which he specifically agreed with the plurality's determination that the jury need not agree on the mode of commission of a single crime when that offense can be committed in various ways). *See also Reed v. Quarterman*, 504 F.3d 465, 482 (5th Cir. 2007) ("In the instant case, we are faced not with alternate theories of premeditated murder and felony murder but with alternate theories of murder in the course of a robbery and murder in the course of attempted rape. It is a reasonable application of *Schad*, however, to conclude that the same result obtains").

### 6. Eighth Amendment

Petitioner argues the unavailability of parole for the offense of continuous sexual assault of a child violates the Eighth Amendment's prohibition against cruel and unusual punishment because it categorically denies parole eligibility to a class of offenders. (ECF No. 1 at 11; ECF No. 3 at 63-

70). Citing to *Graham v. Florida*, 560 U.S. 48 (2010), Petitioner argues that, because the United States Supreme Court has previously determined that sexual assault "does not compare to murder," the categorical denial of parole eligibility to those convicted of the non-homicide crime of continuous sexual assault of a child is disproportionate to sentences imposed for the more serious offense of murder of a child, where the offender would be eligible for parole. (ECF No. 3 at 64 (quoting *Coker v. Georgia*, 433 U.S. 584, 592 (1977)).

Petitioner raised this claim in his appeal; the Third Court of Appeals denied relief on the merits and the Texas Court of Criminal Appeals denied a petition for discretionary review. Accordingly, the Court must "' look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192.

The state appellate court noted this precise claim was raised and rejected in *Glover*,[7] a case arising in Potter County, Texas:

> The Amarillo court wrote that—despite court holdings that murder is a more serious offense than child sexual assault—the nature of the offense, its repetitive nature, and the vulnerability of child victims combined to make the moral culpability of the offenders weigh in favor of the no-parole punishment being constitutional. *Glover*, 406 S.W.3d at 348-49.

*DeLeon*, 2015 WL 3454101, at \*9. Adopting the conclusions delineated in *Glover*, the appellate court concluded: (1) there was a "national consensus in favor of the constitutionality of the sentencing range for this offense;" (2) "despite court holdings that murder is a more serious offense

---

[7] *See Glover v. State*, 406 S.W.3d 343, 347-50 (Tex. App.–Amarillo 2013, pet. ref'd), *cert. denied*, 134 S. Ct. 1882 (2014). *See also Glover v. Davis*, 2018 WL 3598769, at \*3 (N.D. Tex. June 25, 2018), *report and recommendation adopted*, *Glover v. Davis*, 2018 WL 3586269, at \*1 (N.D. Tex. July 26, 2018) (rejecting this claim in Glover's federal habeas action).

than child sexual assault—the nature of the offense, its repetitive nature, and the vulnerability of child victims combined to make the moral culpability of the offenders weigh in favor of the no-parole punishment being constitutional;" (3) the severity of Petitioner's 32-year sentence was constitutional, as the *Glover* court found a sentence of 60 years constitutional; (4) the statute served legitimate penological goals of "retribution, deterrence, and incapacitation," because "those convicted of the crime are already recidivists and [] they are more likely to reoffend than murderers who, aside from serial killers, tend not to reoffend." *Id.*

In *Graham*, the Supreme Court proscribed four factors to be analyzed when considering categorical challenges to statutory punishment schemes: (1) whether there is a national consensus against imposing the punishment at issue; (2) the moral culpability of the offenders at issue in light of their crimes and characteristics; (3) the severity of the punishment; and (4) whether the punishment serves legitimate penological goals. 560 U.S. at 62-71.

The Texas appellate court applied the controlling federal law and Petitioner has not demonstrated the court's decision was an unreasonable application of that law. The cases cited by Petitioner are not on point. The cases primarily exclude classes of defendants from imposition of life-without-parole sentences or the death penalty, which are categorically different from the term-of-years sentence imposed on Petitioner. *See Miller v. Alabama*, 567 U.S. 460, 470 (2012) (prohibiting mandatory life sentences without parole for juvenile offenders); *Graham*, 560 U.S. at 74-75 (holding the Eighth Amendment bars life-without-parole sentences for juvenile offenders who have committed nonhomicide crimes); *Kennedy v. Louisiana*, 554 U.S. 407, 421 (2008) (forbidding imposition of the death penalty for nonhomicide crimes); *Roper v. Simmons*, 543 U.S. 551, 568 (2005) (holding the Eighth Amendment prohibits capital punishment for those under the age of 18

at the time of their crimes); *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (finding the death penalty unconstitutional for offenders with low-range intellectual functioning).

Petitioner has not shown that the state court's rejection of his Eighth Amendment claim was an unreasonable application of clearly existing federal law as established by the United States Supreme Court.

**7. Fifth Amendment**

Petitioner argues his right to remain silent was violated when the prosecutor commented on his failure to testify during the punishment phase. Petitioner raised this claim in his appeal, and the appellate court denied the claim.

The appellate court found:

. . . The controversy centers on the following exchange during the State's punishment argument:

> [Prosecutor]: . . . And it's scary the way that he conducted himself, the absolute denial with what he showed, and then the complete support of his family behind him. I do not believe 25 years, as a punishment, is appropriate in this case. I believe a sentence of 60 years would be appropriate. [M.G.] is going to have to live with this for the rest of her life. And if the Defendant had taken the stand, admitted what he had done, and begged for forgiveness, I believe the minimum sentence would be appropriate. But that's not what we have here.
> [Defense counsel]: Your honor, could we approach the bench?
> (Bench Conference)
>                    DEFENSE MOTION FOR MISTRIAL
> [Defense counsel]: I am going to ask for a mistrial. He did not testify at punishment. He just said to the jury, if he got up on the stand at this phase and told you—
> [Prosecutorl]: I was specifically referring to guilt/innocence.
> [Defense counsel]: He didn't say that. He said, if he got up here and asked for forgiveness—this—I'm asking for a mistrial, Judge.
>                          COURT'S RULING
> The Court: Well, you' re not going to get one. I am going to instruct the jury to disregard that.
> [Defense counsel]: That's unbelievable.

> (Open Court.)
> The Court: Ladies and gentlemen, the last comment by the prosecutor is improper, and you will not consider that for any purpose whatsoever.

*DeLeon*, 2015 WL 3454101, at \*7-8 (emphasis added).

The appellate court concluded that, although the comment violated Petitioner's Fifth Amendment rights, the error was harmless. The court reasoned:

> . . . DeLeon received a sentence of thirty-two years—seven years above the minimum of twenty-five years permitted for the offense of continuous sexual abuse of a child, but well below the maximum life sentence permitted. *See* Tex. Penal Code § 21.02(h). Considering that the sexual abuse of the child found by the jury was committed by an elementary school teacher—one entrusted with the safety and well-being of children—we are confident that the jury was not inflamed by the improper comment and very likely would have assessed the same punishment absent the misconduct. *Hawkins*, 135 S.W.3d at 77. . . .

*Id.*

An error can serve as grounds for habeas corpus relief only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638. Several factors are relevant to federal habeas court's inquiry into whether the prosecutor's improper comment, in violation of Petitioner's Fifth Amendment rights, had a substantial and injurious effect or influence in determining the jury's verdict. The court must consider whether the improper commentary was extensive (or whether it was "'an isolated comment in a sea of evidence'"); the weight of the evidence both for and against the defendant; and the efficacy of any cautionary or curative instruction given to the jury. *Gongora v. Thaler*, 710 F.3d 267, 278 (5th Cir. 2013) (quoting *Cotton v. Cockrell*, 343 F.3d 746, 752 (5th Cir. 2003)).

The prosecutor made only a single comment on Petitioner's silence, and thus the commentary was not extensive. The curative instruction was "perfunctory and devoid of specificity." *Gongora*,

710 F.3d at 280. However, the weight of evidence in favor of a less-than-maximum sentence and the ultimate sentence assessed by the jury indicate the prosecutor's statement did not sway the jury to impose the sentence sought by the prosecutor.

## CONCLUSION

Petitioner has not established that the state courts' denial of his federal habeas claims was contrary to or an unreasonable application of federal law.

## RECOMMENDATION

It is, therefore, recommended that Petitioner's Application for Writ of Habeas Corpus be **DENIED**.

## CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court' s assessment of the constitutional claims debatable or wrong." *Id.* "When a district court denies a habeas petition on procedural grounds without reaching the petitioner' s underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists

of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the dismissal or denial of Petitioner's section 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, it is respectfully recommended that the Court shall not issue a certificate of appealability.

<u>OBJECTIONS</u>

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *Battles v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the

district court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-153 (1985);

*Douglass v. United Servs. Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996) (en banc).

    **SIGNED** on November 28, 2018.

_____

MARK  LANE
UNITED STATES MAGISTRATE JUDGE